UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAUL GARCIA,

　　　　　Petitioner,

　　v.

CLARK E. DUCART, Warden,

　　　　　Respondent.

Case No.  14-cv-03902-HSG (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Raul Garcia, challenging the validity of a judgment obtained against him in state court.  Respondent has filed an answer to the petition.[1]  Petitioner has filed a traverse.  For the reasons set forth below, the petition is denied.

## I.  PROCEDURAL HISTORY

On November 7, 2011, the Monterey County District Attorney filed an amended information charging petitioner with attempted premeditated murder (Cal. Penal Code §§ 664/187(a); count 1) and shooting at an inhabited dwelling (*id.* at § 246; count 2).  The information also alleged the following: that petitioner used a firearm in the commission of the count one offense (*id.* at § 12022.5(a)); personally discharged a firearm in the commission of the count one offense (*id.* at § 12022.53(c)); and committed both the count one and count two offenses to benefit a street gang (*id.* at § 186.22(b)(1)).  1 CT 174-77.

---

[1] Petitioner initially named Greg Lewis, former warden of Pelican Bay State Prison – where petitioner is incarcerated – as the respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Clark E. Ducart, the current warden of Pelican Bay State Prison, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

United States District Court
Northern District of California

On November 15, 2011, a jury convicted petitioner of both counts as charged and found true the firearm-use and gang enhancements.  1 CT 186-89.  On May 11, 2012, the court sentenced petitioner to 15 years to life on count one, a consecutive determinate term of 20 years for the enhancement under section 12022.53(c), and a consecutive term of 15 years to life on count two for a total sentence of 50 years to life.  2 CT 311-13.

On January 28, 2014, the California Court of Appeal affirmed the conviction.  Ex. C.[2]  On March 7, 2014, petitioner filed a petition for review in the California Supreme Court.  Ex. D.  On April 30, 2014, the California Supreme Court denied petitioner's petition for review.  Ex. E. Petitioner did not seek habeas relief in state court.  Petitioner filed the current federal petition for writ of habeas corpus on August 28, 2014.

## II. STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal[3]:

> James Santoyo lived in Castroville with his parents and his younger brothers.  He was at home on December 31, 2009, and his family was gathering to celebrate New Year's Eve.
>
> Santoyo's parents owned an apartment building adjacent to their house.  His sister Marisela[4] lived in an upstairs apartment with her boyfriend Jose Contreras and their young children.  They were in their kitchen making tamales that New Year's Eve.  Around 10:00 p.m., Marisela telephoned Santoyo and asked him to come over.  As he walked up the stairs to the apartment, someone across the street called out, "'Hey, who's that?'" in a loud voice. "What's up?  What's up Homie?"  Santoyo turned around, and the person started shooting at him.  Santoyo "[h]it the floor" and crawled into the apartment.  Marisela called 911.
>
> Monterey County Sheriff's Deputies Brandon Smith and Maria Garcia were on patrol in the area that night.  They heard the gunshots and drove to Wood and Jackson Streets, where the sounds came from.  Santoyo, Marisela, and Contreras told them the suspects ran down a nearby alleyway.  An area search failed to locate the suspects, so the deputies returned to the scene.  Sergeant Randal Ragsac and Deputy Erik Schumacher had arrived in the meantime.

---

[2] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer, unless otherwise indicated.

[3] This summary is presumed correct.  *Hernandez v. Small*, 282 F. 3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254 (e) (1).

[4] Because Santoyo and Marisela share a surname, we refer to her by her first name, not out of disrespect but for convenience and clarity.  For similar reasons, we refer to some of defendant's relatives by their first names.

United States District Court
Northern District of California

Santoyo, Marisela, and Contreras each told the deputies they recognized defendant as one of the shooters. Defendant "lived around the corner." Santoyo said defendant wore a black hoodie.

Schumacher was assigned to the Monterey County Joint Gang Task Force. He had had "numerous contacts" with defendant. Schumacher, Ragsac, and other deputies walked down the alleyway behind the Santoyos' house to defendant's residence. A large group of people was leaving as the deputies approached. Schumacher asked if defendant was among them, and defendant came out of the crowd. Schumacher handcuffed him, and he and another deputy and Ragsac walked him away from the house. When Schumacher told defendant he was being detained for a shooting, defendant asked "how they knew it was him." Schumacher asked what defendant meant by "'they.'" Defendant responded, "'You know, the Santoyos.'" No one had told defendant that Santoyo was the target of the shooting. Contreras positively identified defendant at a showup later that night.

Smith and Schumacher interviewed defendant at the sheriff's office. Defendant told them that he was at home when he heard the gunshots. He described them "exactly the same way" that Smith heard them. Defendant later changed his story and said he was in his room listening to music when his brother said that someone was shooting. Defendant warned his family to get down and to stay away from the windows. When police informed defendant that the victims said he was the shooter, defendant replied, "'[T]here's no way it could have been me.'"

Defendant "readily admitted that he was a gang member . . . ." He said he had been active in the Northside Castroville gang for approximately five years, was in good standing, and was "quote, . . . active to the fullest, end quote" when outside his home. He was aware that gang members committed shootings, armed robberies, and intimidations. He described the significance of each of his Norteño gang tattoos.

Smith contacted Santoyo again and asked how long he had known defendant. Santoyo said he had known defendant, who was about five years his junior, since defendant was a child in the neighborhood. He had seen him "hanging out" with people he knew were Norteño gang members. When Santoyo encountered defendant on the street, defendant mimicked shooting him. As he did so, defendant would "either make comments or . . . make like a pop, pop, pop noise."

On January 2, 2010, deputies executed a search warrant at defendant's residence. They found a black hooded 49er's sweatshirt turned inside out on top of other items on the floor. The sweatshirt had a red logo on it. Deputies also found a black beanie cap and Norteño gang indicia.

Prosecution investigator Allen Rowe interviewed Santoyo, Marisela, and Contreras on March 10, 2010. The interviews were recorded. Santoyo's account of the shooting was consistent with what he told deputies at the scene. He identified defendant as the shooter. He had known him since defendant was "just a little kid" in the neighborhood, "about maybe ten." Defendant's family had moved away. The family later moved back to Castroville. Defendant returned to the neighborhood around summer 2009. That was when the trouble started.

When Rowe asked Santoyo if defendant was affiliated with a gang, Santoyo said that "in the news when it came out they said that he was a Northerner." Rowe followed up, "And what does he think you guys are, Sureños?" Santoyo replied, "You know what I mean? I don't know. You know what I mean? The . . . the way I look I mean, that's the way I . . . You know what I mean?"

3

Contreras told Rowe that his kitchen window looked out on Jackson Street. It was open that night, and as Santoyo came up the stairs, Contreras heard someone say, "'What's up Homie? What's up Homie?'" He looked out the window and saw defendant with the gun. Contreras knew it was defendant because the porch light was bright. Defendant was wearing a beanie. Contreras opened the door, "and they're like 'pow . . . pow . . . pow' like shooting."

Marisela testified at trial that she was in her kitchen when she heard voices say, "What's up, homie" two or three times. Concerned "that something was wrong," she asked Contreras to look out the window. He opened the door. She heard her brother say, "[G]et down," and then she heard gunshots. Marisela called 911. She recalled being interviewed that night but denied telling deputies that she looked out the window and saw defendant. She testified that she did not see defendant or anyone shooting that night.

Marisela went to high school with defendant's older sister. She also knew his mother. She met defendant when he was a preteen or a teenager. He moved back into the neighborhood about eight months before the shooting. Marisela sometimes saw him passing by. On about four occasions before the shooting, he held his hand as if pointing a gun at her and said, "pop, pop."

Santoyo testified under subpoena at trial. "[I] don't want to remember this," he said. "You know, just don't even want to be here." When he was asked if he had been truthful when deputies interviewed him that night, he replied, "You know, I don't know, you know. I don't know what to say." "No." He was asked why he would lie, and he responded, "Well, because I thought it was him, you know, and I don't know for what reason, you know. It was just like I said, you know, it happened so quick."

Santoyo had known defendant for a "couple of years." Defendant had moved back into the neighborhood "months or [a] year" before the shooting. Santoyo was "not sure" if defendant was affiliated with a gang. He did not recall telling Rowe that defendant was "a Northerner." He did not tell Marisela that defendant was the shooter. He did not recall telling Contreras that defendant was the shooter. He denied telling deputies that he had seen the shooter, that the shooter was defendant, and that defendant ran around the corner into the alleyway.

Santoyo was asked why he changed his story. He replied, "Well, because I, you know, I was so scared. You know, I was so scared that, you know, I could'a died that day. Um, I was just, you know, shaking. Um, you know, don't really remember." He did not want his family "to be hurt from stuff like that." He was asked what he thought might happen if he identified defendant as the shooter in court. He said, "Well, you see—you see, I can't say it's him."

Santoyo testified that he had no idea why someone shot at him twice. Nor did he know why someone fired shots at his parent[s]' house in August 2009. He does not have Sureño tattoos. He had not had any trouble with Norteños, "the rival street gang," apart from the shootings. Santoyo was arrested for a gang crime when he was "in school." He was convicted of displaying a firearm in public "years, years, years back" but separated himself from the gang lifestyle when he was about 17. He was 27 when he testified at trial. He pleaded guilty to an unspecified crime in 2009.

Contreras testified that he heard someone say, "What's up, homie" as Santoyo came up the stairs that night. Contreras opened the door. Santoyo told him to get down, and the shooting started.

Contreras testified that he saw "two people in black" across the street "[m]inutes before" the shooting. "[A]fter the shooting, there was one person in black. That's all I saw." He

denied telling deputies that he saw defendant shooting at Santoyo. He later said, "I thought it was him." He denied telling Rowe he saw defendant in the area before the shooting. He denied telling Rowe he looked out the window when the shooting began and recognized one of two persons across the street as defendant. He denied telling the deputies he saw defendant run around the corner after the shooting. "I saw a person. I saw a person running into the alley." He acknowledged that Marisela told the 911 dispatcher that defendant was the shooter.

Contreras said he identified "[t]he one I thought had done it" at the showup. "Well, what I'm saying is I'm not sure exactly if it was him, but that's what I thought." Lighting illuminated the street and the area that the shooter shot from.

Contreras did not know defendant but had seen him passing by. "[O]ne time," defendant acted like he had a gun raised toward the apartment and said "pop, pop." Contreras denied telling Rowe defendant did that more than once. The Santoyos' house had been shot at three times. The problems started when defendant moved back to the neighborhood. Contreras was "concerned" about what would happen to his children, Marisela, and her family if he testified against defendant. "We're all concerned."

Smith, Ragsac, and Schumacher testified about what occurred that night. They described the investigation. Schumacher also testified as an expert on Monterey County criminal street gangs. He opined that defendant was an active participant in a Norteño criminal street gang. His opinion was based in part on defendant's tattoos, one of which he acquired in jail after the shootings. Schumacher's opinion was also based on defendant's admissions, prior police contacts, and intake screening questionnaire, which reflected his association with the Norteños. Schumacher told the jury that the Norteño gang's primary activities included homicide, violent assaults, and trafficking in drugs and firearms. He identified three predicate offenses: possession of a firearm by a gang member in 2007 and two attempted murders of suspected Sureños, one in 2005 and another in 2004. Certified court records establishing those convictions were admitted into evidence.

Schumacher explained that Norteños and Sureños are rivals. Castroville is Norteño territory. There is only "[a] small handful" of Sureños in the area. The primary reason Norteños have firearms is "to carry out actions against rival gang members." Firearms help them establish their gang territory, since attacks on rival gang members "will typically force small numbers of rivals or people who aren't like them to move out of the area." That "allows more Norteños . . . to move in and saturate that area." Attempted murder promotes the gang by "put[ting] the notoriety out for everybody to see." That makes it easier for the gang to recruit new members. Shooting at an inhabited dwelling benefits the gang for the same reasons. It also intimidates the public. "[I]f the public sees they're just shooting at a house and have total disregard for everybody inside the house, they know that that could be their house. If they go tell law enforcement . . . this is what they saw, if somebody finds out, they could be getting shot at."

Schumacher said a gang member who testified against another gang member or about something that would harm the organization "could have some type of retribution." He would be considered a snitch, and "'[s]nitches get stitches.'" Their families "and anybody else associated closely with them" would be threatened. Gang members are not the only ones who suffer retribution. A snitch "can be anybody."

Rowe described his investigation. He authenticated the recordings of his interviews with Santoyo and Contreras, and they were played for the jury. The jury viewed photographs that Rowe had taken and a diagram of the apartment.

Defendant's uncle Saloman Garcia testified for the defense. He and his family arrived at his brother's house in Castroville around 9:50 p.m. that New Year's Eve. "We were trying

to get there before ten, before that new show came out . . . Jersey Shore." A little after 10:00 p.m., he and his niece left to buy sodas. They returned and were getting out of the car when Saloman heard "maybe about between four and five" shots. A "couple seconds later that's when [defendant] pops out the top window and tells us that there was shooting happening and to get inside the house." Saloman conceded that he did not share that story until the week before he testified.

Defendant's 16-year-old sister Selena testified that she accompanied her uncle to the store. They left "[a] little before" 10:00 p.m. She heard "four or more gunshots" when they returned, and defendant "popped out his head and said get in the house."

Defendant's mother Guadalupe Nicasio said she was upstairs in her daughter Jennifer's room around 10:00 p.m. that evening getting ready to go to a party. Her daughters Vanessa and Selena were with her. Defendant was sitting on Jennifer's bed watching Jersey Shore. He was in the room with Nicasio "the whole time." The house "was chaos" with grandchildren and family members. Nicasio did not hear gunshots.

Nicasio maintained that her various statements about defendant's whereabouts around 10:00 p.m. were "consistent." He "was in and out." He was "up and down the stairs. He could have been—he was downstairs, he was upstairs" when the commotion occurred. Her son Daniel came into the room "and said there was gunshots." Defendant came back into the room "[r]ight away." "[H]e came right back up stairs [*sic*]" and "stood by the window" that faces the alley, "concerned for his sister and his uncle to get inside."

Nicasio testified that the deputies arrived "like maybe 15, 20 minutes after Selena and them got home." Nicasio told them that she was with defendant "the whole time." She asked them to review the Santoyo family's surveillance video and to do a gunshot residue test. Three days later, the deputies returned with a search warrant. "They were looking for a .45 caliber gun." They took jerseys, shoes, and CD's. They did not find a gun.

Nicasio told the jury that she went to get her mail about a month before trial and saw Santoyo and another man painting an apartment. The man was Santoyo's brother Gogie. He waved to her, and Nicasio "took it upon [herself]" to approach "as a friendly gesture." She told Gogie that she did not want the family to feel "like we were, you know, enemies because we're not enemies." She testified that Santoyo told her that he "didn't have any problems with anybody."

Nicasio testified that Santoyo approached her two weeks later when she was outside speaking with her neighbors. "And, uh, and, uh, before the conversation was over, he told me that, um, before—that he goes the guy who did the shooting, he goes, pulled a gun on me twice before." Santoyo did not tell Nicasio who that person was. "He just told me it was somebody, you know, I guess he grew up with." She assumed Santoyo was talking about the New Year's Eve shooting.

Neighbor Roscoe Scally told the jury that he knew defendant's and the Santoyos' families "well" because he lived "literally in the middle of them" on Jackson Street. He met defendant two days before the shootings when defendant offered to help him move something off his truck. He knew Santoyo "through his kids." Scally had pool tables and weights at his house. "[P]retty much every kid that lives on that street," including Santoyo's two young children, used his house as a recreation center.

Scally had moved from Los Angeles to Castroville "to get away from that [gang] stuff." He was involved in a gang in Los Angeles but was not a gang member "in the [sense] of anything that pertains here." He had "a couple" felony convictions, including one for armed robbery.

Scally described a conversation he "very recently" had with Santoyo. It occurred in April 2011, "right after I guess he had spoke to [defendant's] mother." The conversation gave Scally "the impression" that Santoyo "didn't feel comfortable [with] what was going on." Santoyo "felt he didn't want to testify." He told Scally that he knew who shot at him because the person pulled a gun on him twice before. The person's street name was Pelon. Scally believed that Santoyo was talking about the New Year's Eve incident "based on—I didn't know of another incident." Pelon died "sometime this year or at the end of last year." After his conversation with Santoyo, Scally "went and talked to [defendant's mother] myself."

Santoyo testified in rebuttal that he did not tell defendant's mother or Scally that someone else was the New Year's Eve shooter. He did not tell Scally that Pelon was the shooter.

*People v. Garcia*, No. H038330, 2014 WL 295168, at *1-6 (Cal. Ct. App. Jan. 28, 2014) (footnote in original).

### III. DISCUSSION

**A.     Standard of Review**

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review. The California Court of Appeal, in its opinion on direct review, addressed the four claims petitioner raises in the instant petition. The court of appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the court of appeal's decision that this Court reviews herein. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

**B.      Petitioner's Claims**

Petitioner asserts the following grounds for relief: (1) the trial court's admission of gang expert testimony violated due process; (2) there was insufficient evidence to convict petitioner of a gang enhancement; (3) the trial court improperly excluded evidence favorable to his defense; and (4) petitioner received ineffective assistance of counsel.

**1.      Admission of Gang Expert Testimony**

Petitioner claims that the trial court violated his due process right to a fair trial by admitting Investigator Rowe's testimony that victims of gang violence often recant their previous

United States District Court
Northern District of California

statements when called to testify at trial.  Petition at 6.  Respondent argues that this claim is procedurally defaulted, and even if it were addressed on its merits, it must be denied.

The California Court of Appeal summarized and rejected petitioner's claim as follows:

1. Background

Rowe testified that he had 34 years of experience in law enforcement, 28 of those conducting investigations, particularly gang-related investigations.  During a five-year assignment at a maximum security prison, he investigated "in the neighborhood of 2,500–plus gang-related crimes...."  He had been employed as an investigator by the Monterey County District Attorney's Office for the previous 11 years.  He had extensive experience working with crime victims and witnesses, verifying their statements, and assisting them through the court process.  He had conducted "countless" interviews, "[t]housands probably."

The prosecutor told Rowe, "I'd like to talk to you a little bit more about your experience with victims and witnesses."  "Approximately how many victims of gang crimes have you worked with?"  Defense counsel interposed a one-word "relevance" objection.  An unreported bench conference followed.  The prosecutor then asked Rowe, "Based on your training and experience in that line so far, is it common or uncommon for victims and witnesses to change their story when they testify?"  Rowe responded, "Certain victims will or do."  "Gang-related victims, [domestic violence victims]."  Defense counsel objected that the question called for a narrative.  The trial court implicitly overruled that objection, and Rowe finished his answer.  "[V]ictims of [domestic violence] often recant, as well as gang-related victims or victims of organized crime."

2. Analysis

Defendant challenges the admission of Rowe's testimony about recanting victims on several grounds.  He argues that the prosecution did not offer Rowe as an expert witness and the court did not expressly qualify him as such, so his testimony must be viewed as improper lay opinion evidence.  Defendant also argues that the admission of Rowe's testimony usurped the jury's function as the sole arbiter of witness credibility and lessened the prosecution's burden of proof in violation of his rights to due process and a fair trial.  The Attorney General counters that defendant forfeited the argument.

We agree with the Attorney General.  Defendant raised none of these arguments below.  They are forfeited on appeal.  (Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 435 (*Partida*).)

Defendant argues that he interposed a relevance objection when the prosecutor sought "to lay the groundwork for the target question" and asked Rowe how many victims of gang crimes he had worked with.  Defendant claims it would have been futile to "reassert" his relevance objection because the court had already rejected it.  The argument lacks merit.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to . . . the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."  (Evid. Code, § 353; *Partida, supra*, 37 Cal.4th at p. 435.)  "'Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence.' [Citation.]"  (*People v. Boyette* (2002) 29 Cal.4th 381, 424 (*Boyette*).)  "'"While no particular form of objection is required [citation], the

objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility." [Citation.]' [Citations.]" (*People v. Rivera* (2011) 201 Cal.App.4th 353, 361.)

Defendant's relevance objection lacked the requisite specificity. The single word "relevance" provided no hint that the objection was based on the failure to formally qualify Rowe as an expert. This was an oversight that the prosecutor and the court could easily have corrected. Defendant's single word "relevance" objection did not suggest that the prosecutor's question called for improper lay opinion testimony either. The one-word objection was plainly insufficient to alert the trial court to the basis on which exclusion of the evidence was sought or to afford the People an opportunity to establish its admissibility. (*Rivera*, *supra*, 201 Cal.App. 4th at p. 361.) It did not preserve defendant's argument for appeal. (Evid. Code, § 353; *Partida*, *supra*, 37 Cal.4th at p. 435.)

We would reject defendant's argument even if he properly preserved it. Defendant does not challenge Rowe's qualifications. On the contrary, he concedes that Rowe had "considerable experience interviewing crime victims, including gang-crime victims." His complaint is that "the court did not qualify [Rowe] as an expert, nor did the prosecution proffer him as one." But that does not render Rowe's testimony inadmissible. "[W]hile Evidence Code sections 720, subdivision (a), and 802 provide that the person testifying as an expert must be qualified by special knowledge, skill and experience, these foundational requirements need not be established in the absence of a specific objection or unless the court, in its discretion, requires it." (*People v. Rodriguez* (1969) 274 Cal.App.2d 770, 776.) Defendant raised no such objection below, and the trial court did not require expert qualification.

*People v. Garcia*, 2014 WL 295168, at *6-7.

### a.    Procedural Default

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred. *See id.* at 750. The rule cited here by the court of appeal, specifically, that a defendant must make a contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule to support the denial of a federal petition on grounds of procedural default. *See Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (finding claim procedurally defaulted based on California's contemporaneous objection rules). The claim is therefore procedurally defaulted.

### b.    Merits Analysis

Alternatively, even if this claim were not procedurally barred, petitioner would not be

entitled to federal habeas relief.  The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986).  "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis in original) (quoting *Kealohapauole v. Shimoda*, 800 F. 2d 1463, 1465 (9th Cir. 1986)).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  Finally, even where an evidentiary error is of constitutional dimension, the court must consider whether the error had a substantial and injurious effect on the verdict.  *Brecht v. Ambrahamson*, 507 U.S. 619, 638 (1993); *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

Petitioner claims that Investigator Rowe's testimony "usurped" the role of the jury and violated his due process right to a fair trial.  Petition at 6.  The Court disagrees.  Rowe simply testified that certain types of victims, including victims of gang violence, often recant their previous statements.  Evidence introduced "will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions." *Jammal*, 926 F.3d at 920.  Due process is violated only if *none* of these inferences are permissible.  *Id.*  Because the jury could have drawn a "permissible inference" that the witnesses *might* have changed their stories out of fear, petitioner's constitutional rights were not violated.  *See id.*  Moreover, Rowe's testimony was not of such "quality" that it "necessarily prevent[ed] a fair trial." *Id.*  The evidence was extremely general and only covered the experiences of one police officer.  Rowe and the prosecutor made it overwhelmingly clear that the testimony was about victims in general.  He did not express an opinion on whether the witnesses in this case were truthful at trial.  Rowe's testimony was not essential to convict petitioner, and there is no indication that the jury relied heavily upon it.

Even if admission of the expert testimony was federal constitutional error, there was no prejudice.  On habeas corpus the test for prejudice is "whether the error had substantial and injurious

effect or influence in determining the jury's verdict" *Brecht*, 507 U.S. at 637 (internal quotation marks omitted).  Here, there was other testimony that victims and witnesses of gang-related crimes may change their stories when called to testify.  Deputy Schumacher testified that gang members commit crimes of violence to intimidate others:

> [I]t goes back to the intimidation of the public.  And if the public sees they're just shooting at a house and have total disregard for everybody inside the house, they know that that could be their house.  *If they go tell law enforcement or somebody else this is what they saw, if somebody finds out, they could be getting shot at, and do they want their kids and family put in that predicament.*

4 RT 941 (emphasis added).  Additionally, Deputy Schumacher explained that anyone who "snitches" on the gang, whether he or she is a gang member or an ordinary citizen, could face retribution.  5 RT 1213-14.  Schumacher elaborated, "Anybody that [the gang members] look at as being a rat, who will go out and give information up on particular gang members, on a particular gang, on the gang as a whole.  If they're trying to give information that will be detrimental to the gang . . . they refer to them as 'snitches.'"  5 RT 1229-30.  One does not have to be a gang member to be labeled a snitch, "[i]t can be anybody."  5 RT 1230.  If one were to testify against a gang member, whether Norteño or Sureño, there would be "ramifications."  5 RT 1231.

Furthermore, there is independent evidence that Santoyo and Contreras were afraid to testify against petitioner.  During investigation, Santoyo told Rowe that no one in the neighborhood wanted to identify petitioner as the person engaging in violence because "people don't wanna say anything cuz they . . . I mean you know they're scared too."  2 CT 394.[5]  Santoyo also told Rowe, "I'm kinda scared of him too, but . . . ."  2 CT 394.  Santoyo continued, "Like if I say they're kinda scared. Everybody that lives on the block . . . they don't wanna say nothing."  2 CT 395.  He explained, "[T]hey're gonna be like, 'Well you know what?  You're gonna get it too.'  You know?"  2 CT 395. "[S]o I'm kinda tired myself, you know?"  2 CT 395.

At trial, when Santoyo was asked why he changed his story after identifying petitioner twice previously, he testified, "[B]ecause I, you know, I was so scared.  You know, I was so scared that, you know, I could'a died that day.  Um, I was just, you know, shaking.  Um, you know, don't really

---

[5] All ellipses in this paragraph are in the original transcripts.

United States District Court
Northern District of California

remember." 3 RT 655-56. Santoyo admitted that he was still scared for himself and his family. 3 RT 656-57. Contreras also testified that he was concerned about the welfare of his children, their mother, and his mother-in-law if he testified against petitioner. 3 RT 707-08.

Finally, the evidence identifying petitioner as the shooter on December 31, 2009, was strong. Almost immediately after the shooting, Santoyo and Contreras unequivocally identified petitioner to the police as the person who fired the shots. Contreras also identified petitioner in an in-field show up shortly after petitioner's arrest. In recorded pretrial interviews by Investigator Rowe, Santoyo and Contreras confirmed that petitioner was the shooter.

These identifications were corroborated by petitioner's statement when he was contacted by the police the night of the shooting. When Deputy Schumacher told petitioner that he was a suspect in a shooting, petitioner asked, "How do they know it was me?" 3 RT 753, 772-73. Schumacher asked, "What do you mean by 'they'?" Petitioner responded, "The Santoyos." 3 RT 753, 773. No law enforcement officer had mentioned the name of the victim at that point. 3 RT 753-54, 773. That petitioner knew he had been identified by the Santoyos before anyone had mentioned Santoyo's name to him shows a knowledge of the details of the shooting known only to the shooter and to Santoyo and his family. Based on the strength of the evidence supporting the charged offenses, and independent evidence that Santoyo and his family were afraid to testify, any error was harmless.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 2.    Sufficiency of Evidence

Petitioner claims that there was insufficient evidence that his crime was committed to further the objectives of a criminal street gang pursuant to California Penal Code section 186.22. Petitioner argues that there was no substantial evidence that he shot at the apartment with the requisite intent, but instead asserts that it was for "personal reasons." Petition at 6.

The California Court of Appeal summarized and rejected this claim as follows:

Section 186.22 authorizes an enhancement when a defendant is convicted of a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1). [Citations.]" ([*People v.*] *Albillar*, 51 Cal.4th

[47] at p. 63 [(2010)].)

Here, there was ample evidence that defendant's crimes were committed for the benefit of his Northside Castroville gang. Defendant admitted that he was a Norteño and bragged about being "active to the fullest" when outside his home. There was evidence to support an inference that Santoyo was once associated with the Sureños. Santoyo admitted participating in gang activities in high school. He referred to an arrest for "a gang crime" and to a conviction for displaying a firearm in public. Evidence that defendant lived in the neighborhood as a child supported an inference that he was aware of Santoyo's Sureño gang ties.

The jury heard expert testimony that Norteños and Sureños are rivals and that Castroville is largely Norteño territory. Schumacher explained that attacks on rival gang members help the gang establish its territory by forcing rivals to move out of the area, which "allows more Norteños . . . to move in." He explained that the attempted murder of a rival gang member benefits the gang by "put[ting] the notoriety out for everybody to see." That brings attention to the gang and makes recruitment easier. Shooting at an inhabited dwelling benefits the gang for the same reasons. It also intimidates the public. We conclude that there was sufficient evidence to support the true findings on the gang enhancement allegations.

Defendant argues that there was "no evidence" that his three victims were rival gang members. Although he concedes that Santoyo had been a Sureño "as a boy," he claims there was no evidence Santoyo remained a gang member 10 years later.

Whether Santoyo remained a gang member is not dispositive. Schumacher testified that Norteños establish their territory by forcing rivals "or people who are not like them to move out of the area." As a former Sureño, Santoyo was "not like" Northside Castroville gang members. The jury could reasonably have concluded that defendant shot at him for that reason.

Defendant highlights Santoyo's testimony that he separated himself from the gang lifestyle when he was 17. To the extent the jury believed Santoyo's testimony, it could reasonably have concluded that defendant was not aware of Santoyo's claimed disassociation from the gang because defendant had only recently returned to the neighborhood. Santoyo's response when he was asked whether "people" who saw him on the street recognized his separation from the gang bolstered that conclusion. He responded, "Well, they don't tell me nothing . . . . I don't tell them nothing." Santoyo's statements about "the way I look" and how "I dress up" when Rowe asked him if defendant believed his family were Sureños further supported a conclusion that defendant believed Santoyo was still a Sureño. We conclude that there was substantial evidence from which the jury could have found that defendant believed Santoyo was a rival gang member and shot at him for that reason. Sufficient evidence thus supported the element that defendant committed his crimes "for the benefit of . . . a criminal street gang." (§ 186.22, subd. (b)(1).) Defendant does not challenge the sufficiency of the evidence to support any other elements of the gang enhancements. It follows that the true findings were supported by sufficient evidence.

*People v. Garcia*, 2014 WL 295168, at *8-9.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Consequently, where a state prisoner alleges the evidence in support of his state conviction cannot be fairly characterized as sufficient to have

1    led a rational trier of fact to find guilt beyond a reasonable doubt, such petitioner states a

2    constitutional claim. *Jackson v. Virginia*, 443 U.S. 307, 321 (1979).  If proven, such a claim

3    entitles petitioner to federal habeas relief.  *Id*. at 324.  The relevant inquiry is whether, "after

4    viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

5    have found the essential elements of the crime beyond a reasonable doubt."  *Id*. at 319 (emphasis

6    in original).  Where the record supports conflicting inferences, a federal habeas court must

7    presume the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to

8    that resolution.  *Id*. at 326.  "Circumstantial evidence and inferences drawn from it may be

9    sufficient to sustain a conviction."  *United States v. Jackson*, 72 F.3d 1370, 1381 (9th Cir. 1995).

10   Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the

11   writ be granted.  *Jackson*, 443 U.S. at 324.

12        Sufficiency of evidence claims are subject to "two layers of judicial deference."  *Coleman*

13   *v. Johnson*, 132 S. Ct. 2060, 2062 (2012).  In reviewing habeas petitions, "a federal court may not

14   overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the

15   federal court disagrees with the state court.  The federal court instead may do so only if the state

16   court decision was 'objectively unreasonable.'"  *Id*.

17        Viewing the record in the light most favorable to the prosecution, there was ample

18   evidence upon which to convict petitioner of the gang enhancement.  Santoyo was involved with a

19   gang when he was younger, freely admitting that he had engaged in gang activity in the past and

20   had been convicted of carrying a firearm.  3 RT 658-60, 669.  Petitioner and Santoyo knew each

21   other when they were younger as well: "Because you know . . . I know him since you know what I

22   mean, we were small" (around ten years old).  2 CT 386-87.  Petitioner also displayed animosity

23   towards Santoyo.  Santoyo indicated that petitioner had made threatening, gun-like gestures at him

24   while on the street.  2 CT 381.  Petitioner has never contested his Norteño gang membership,

25   bragging that he was "active to the fullest."  *Garcia*, 2014 WL 295168 at *2.

26        Even if the evidence of Santoyo being a rival is disregarded, the record includes expert

27   testimony that gang members often shoot indiscriminately at houses as a way of establishing their

28   territory, hoping that "people who aren't like them," members of rival gangs or not, move out so

15

1    that more gang members can "move in and saturate the area." 4 RT 938.  Considering petitioner's

2    unabashed membership in the Norteño gang, this testimony alone was sufficient to convict

3    petitioner on the gang enhancement, as the jury could have reasonably found that petitioner was

4    attempting to establish Norteño territory.  Given this evidence, and the doubly deferential standard

5    of review, the state court reasonably rejected this claim.

6         Accordingly, petitioner is not entitled to habeas relief on this claim.

7    **3.    Exclusion of Evidence**

8         Petitioner claims that the state court deprived him of a fair trial when it excluded evidence

9    of prior false accusations made against petitioner's family by the Santoyos.  Petition at 6.

10        The California Court of Appeal summarized and rejected this claim as follows:

11   Defendant challenges the exclusion of evidence of "two prior incidents in which [his]
12   family members were accused by Santoyo family members of shooting or threatening
     them."

13   1. Defendant's Cousin's Testimony

14       a. Background

15   Santoyo's mother was struck by bullets fired at her house on August 12, 2009.  Deputies
16   detained defendant's cousins Jeremy and Mitchell Rios, who lived nearby on Jackson
     Street.  They and a visiting friend were held for several hours on the street outside the
17   Rios's house and released after gunshot residue tests were performed.

18   Toward the end of the prosecution's case-in-chief, the defense moved to recall Santoyo to
     elicit "information whether as a result of his accusations," defendant's cousins and their
19   friend were detained for "roughly three or four hours."  The trial court conducted an
     Evidence Code section 402 hearing at which Jeremy testified.  He told the court he heard
20   gunshots that night.  A little later, he heard a man "yelling at my house."  He believed the
     "elderly" man was "a relative" of the Santoyos.  Jeremy called 911.  When the police
21   arrived, they detained him, Mitchell, and their friend Eunice in separate vehicles outside
     his house.  Jeremy claimed deputies told him that "[t]hey're saying that I was the one that
22   shot their mom."  Deputies did not name his accusers.

23   Jeremy was "sure" the person he saw screaming outside his house was not Santoyo.  He
     conceded that the deputies never said Santoyo accused him.  "[T]hey just kept saying
24   'them' and 'they,' so I took it as the whole family was saying that I did it."

25   The trial court excluded the proffered evidence as irrelevant because there was no evidence
     tying Santoyo to any false accusation.  The court explained that "[t]he only mention of
26   James Santoyo in the entire [police report of the incident] is the following day ... there's
     nothing in the report to indicate he was present at the time of the shooting at his mother's
27   residence.  He was not interviewed by the police on the 12th.  He didn't identify anyone on
     the 12th.  He didn't indicate which house the suspects allegedly came from.  [¶]  He's
28   contacted on the 13th at his mother's residence, and his entire participation was to say that
     his mother had returned from the hospital, was resting and didn't feel well enough to give a

United States District Court
Northern District of California

statement....  [¶]  There's absolutely nothing in the report indicating he had anything to do with identifying anyone in regards to this shooting."

       b. Analysis

Defendant argues that the false-accusation evidence was relevant to impeach his three victims' identifications of him as the New Year's Eve shooter.  We disagree.

 "Only relevant evidence is admissible, and the trial court has broad discretion to determine the relevance of evidence."  (*People v. Cash* (2002) 28 Cal.4th 703, 727.)  "A trial court's rulings on relevance and the admission or exclusion of evidence are reviewed for abuse of discretion."  (*People v. Aguilar* (2010) 181 Cal.App.4th 966, 973.)

The trial court did not abuse its discretion in excluding Jeremy's testimony.  Jeremy conceded that deputies never named his accusers.  There was "absolutely nothing" in their report to indicate that Santoyo had anything to do with identifying anyone involved in the shooting.  Jeremy did not see Santoyo in the area that night.  There was no evidence that Santoyo was present.  The proffered impeachment testimony suggested nothing about Santoyo's veracity.  On this record, it was not an abuse of discretion to exclude the proffered impeachment testimony.

Defendant claims the proffered testimony was also relevant to impeach Marisela's and Contreras's identifications of him as the shooter.  His failure to raise that argument below forfeited it on appeal.  (*People v. Hartsch* (2010) 49 Cal.4th 472, 496.)  He also forfeited his argument that Jeremy's testimony was relevant to establish that the shooting was committed because of a "family feud" rather than for the benefit of a criminal street gang.  (*People v. Morrison* (2004) 34 Cal.4th 698, 712.)

2. Defendant's Brother's Testimony

       a. Background

The defense sought to introduce evidence that Santoyo wrongly accused defendant's brother Daniel of brandishing a gun at him.  Defense counsel told the court that police went to defendant's residence on May 20, 2011, questioned his mother, and searched the house for Daniel.  Daniel was at work in Seaside at the time.  Police telephoned him there, and that was the end of the matter.  Defense counsel told the court police "indicated" that the person who accused Daniel was "the person that lived on the corner of Wood and Jackson Street."  Defendant's mother would testify about the incident.  "Daniel would testify that he always saw [Santoyo] outside.  And while they didn't name [Santoyo] in particular, that it couldn't be anybody but [Santoyo] that had identified him."

The trial court excluded the evidence as irrelevant.  The court noted that there was "a whole group of males" in the Santoyo family.  It observed "that there's nothing that would place [Santoyo] as the person who erroneously identified Daniel on that date.  There's absolutely no police report that [Santoyo] even called the police."  The prosecutor confirmed the court's understanding.  She represented that she contacted the sheriff's division and personally reviewed "every single report" that mentioned Santoyo "going back to 2004."  She found no indication that Santoyo had accused "anybody in the Garcia family" of any shooting or brandishing.

The court ruled the evidence inadmissible.  "I don't find it to be relevant.  I don't find any identification of [Santoyo] that would go to his credibility or show some motive of his to fabricate . . . ."  The court cited Evidence Code section 352 as a second ground for excluding the evidence.  "Pursuant to 352, it would cause a mini-trial.  We would be proving up and disproving events that may or may not have happened.  I don't find that it

25

would be probative.  I think it would confuse the jury. . . ."

    b. Analysis

Defendant argues that the evidence was relevant to impeach his three victims' credibility by establishing the Santoyo family's bias against him and his family.  He contends that the trial court abused its discretion in excluding it because it "had great probative value and posed no risk of undue prejudice as that term is used in section 352."  We disagree.

Evidence Code section 352 gives the court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  An appellate court will not disturb a trial court's exercise of discretion in admitting or excluding evidence "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

There was no abuse of discretion here.  The link between the Santoyos and the alleged false accusation was tenuous.  Daniel's proffered testimony that "it couldn't be anybody but [Santoyo]" was entirely speculative.  There was no police report of the incident.  There was no report that Santoyo called police on May 20, 2011.  The prosecutor's review of "every single" police report "going back to 2004" strongly suggested that to the extent a brandishing occurred, someone other than a Santoyo family member reported it.  The Santoyos' house was not the only one that fit the description "on the corner of Wood and Jackson Street."  A resident of a different house on the corner could have witnessed and reported a brandishing.  The proffered testimony provided only a speculative link between the alleged false accusation and the Santoyos.  Thus, it was only marginally probative.

The marginal probative value of the proffered evidence was greatly outweighed by the likelihood that it would consume an undue amount of time and confuse the jury.  As the trial court correctly noted, admission of the evidence would require mini trials to establish whether the alleged events happened and how, if at all, Santoyo and/or his family were involved.  The potential for distracting the jury with tangential issues was great.  Testimony from Daniel, his mother, his uncle, one or more officers, and witnesses offered by the prosecution would have consumed an undue amount of time.  Exclusion of the evidence was not an abuse of discretion.

Defendant argues that exclusion of the false-accusation testimony violated his constitutional rights to present a defense and to due process.  We disagree.  "[T]he application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution . . . ."  (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.)  Nor do those rules impermissibly infringe on the accused's right to present a defense.  (*People v. Jones* (1998) 17 Cal.4th 279, 305.)  "'[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.' [Citations.]  This latitude, however, has limits.  'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."' [Citations.]  This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are '"arbitrary" or "disproportionate to the purposes they are designed to serve."' [Citations.]"  (*Holmes v. South Carolina* (2006) 547 U.S. 319, 324-325 (*Holmes*)).

There was no application of an "'"arbitrary"'" state rule of procedure here.  (*Holmes, supra*, 547 U.S. at p. 324.)  Nor was exclusion of the evidence "'disproportionate to the purposes'" that Evidence Code section 352 is designed to serve.  (*Holmes*, at p. 324.)

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, unlike in the cases he cites, defendant was not denied access to information necessary to prepare his defense. (*Pennsylvania v. Richey* (1987) 480 U.S. 39, 56.) He was not precluded from testifying on his own behalf. (*Rock v. Arkansas* (1987) 483 U.S. 44, 52-53; *People v. Bradford* (1997) 15 Cal.4th 1229, 1332.) The excluded evidence did not involve third party culpability (*Chambers v. Mississippi* (1973) 410 U.S. 284) or the way in which a confession was obtained. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) Defendant's constitutional rights were not violated.

*People v. Garcia*, 2014 WL 295168, at *10-12.

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision, or by depriving the defendant of the fair trial guaranteed by due process. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original) (quotation marks omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (due process does not guarantee a defendant the right to present all relevant evidence). But this latitude is limited by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *Holmes*, 547 U.S. at 324. While the Constitution thus protects defendants, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326-27. Due process is violated only where the excluded evidence had "persuasive assurances of trustworthiness" and was "critical" to the defense. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). "Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013). Violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict. *See Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (citing *Brecht*, 507 U.S. at 637-38).

Applying these legal principles here, petitioner's claim fails. First, regarding petitioner's cousin's testimony, as the state appellate court indicated, the police report of the incident contained "absolutely nothing" indicating Santoyo had anything to do with the incident. *Garcia*,

1    2014 WL 295168 at *10.  Petitioner's cousin even conceded that the deputies never named his

2    accusers.  *Id.*  On this record, the evidence had no "persuasive assurances of trustworthiness."

3    *Chambers*, 410 U.S. at 302.[6]

4           The same is true of petitioner's brother's testimony.  As described above, petitioner

5    attempted to introduce evidence that Santoyo wrongly accused petitioner's brother, Daniel, of

6    brandishing a gun at him.  As the state appellate court indicated, however, there was nothing to

7    corroborate that the incident occurred, i.e., there was no police report.  *Garcia*, 2014 WL 295168

8    at *12.  Nor was there anything connecting Santoyo to the incident other than Daniel's own

9    subjective, speculative belief that "it couldn't be anybody but [Santoyo]."  *Id.*

10          This evidence was also extrinsic, and petitioner asserts that its only relevance was to

11   impeach his identifiers.  The admission of "extrinsic evidence of specific instances of a witness'

12   conduct to impeach the witness' credibility may confuse the jury, unfairly embarrass the victim,

13   surprise the prosecution and unduly prolong the trial."  *Jackson*, 133 S. Ct. at 1993-94.  No

14   Supreme Court decision "clearly establishes that the exclusion of such evidence for such reasons

15   in a particular case violates the Constitution."  *Id.*

16          Moreover, the proffered evidence from both petitioner's cousin and brother was not "vital"

17   to petitioner's defense.  *Chambers*, 410 U.S. at 302.  Petitioner's main defense was to establish an

18   alibi that he was at home watching the premiere of Jersey Shore and "popped" his head out of the

19   window to warn his family when he heard gunshots.  *See*, *e.g.*, 5 RT 1299, 1308, 1317.

20          Finally, as discussed above, the state's case consisted of strong evidence pointing to

21   petitioner's guilt.  Petitioner thus fails to demonstrate that the exclusion of the family feud

22   evidence "had substantial and injurious effect or influence in determining the jury's verdict."

23   *Brecht*, 507 U.S. at 637.

24          Accordingly, petitioner is not entitled to habeas relief on this claim.

25          **4.      Ineffective Assistance of Counsel**

26

27   _____

     [6] Petitioner's claims that the cousin's testimony should have been admitted to impeach Marisela's

28   and Contreras' identification of petitioner and to refute the gang allegations are procedurally
     barred.

United States District Court
Northern District of California

United States District Court
Northern District of California

Petitioner claims he received ineffective assistance of counsel because his attorney failed to argue for the inclusion of the false-accusation evidence, addressed in claim 3 above, which forfeited the claim on appeal.  Petition at 6B.

The California Court of Appeal summarized and rejected this claim as follows:

Defendant argues that his trial counsel was prejudicially deficient to the extent he forfeited arguments about the relevance of the family-feud and false-accusation evidence.  We disagree.

A defendant seeking reversal for ineffective assistance of counsel must prove both deficient performance and prejudice.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 218; *Strickland v. Washington* (1984) 466 U.S. 668, 687 ( *Strickland* ).)  The first element "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland,* at p. 687.)  The court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct." (*Id.* at p. 690.)  When counsel's conduct can reasonably be attributed to sound strategy, a reviewing court will presume the conduct was the result of a competent tactical decision, and defendant must overcome that presumption to establish ineffective assistance.  (*Ibid.*)  "Second, the defendant must show that the deficient performance prejudiced the defense." (*Id.* at p. 687.)  A court deciding an ineffective assistance claim does not need to address the elements in order, or even to address both elements if the defendant makes an insufficient showing on one. (*Id*. at p. 697.)

Defendant claims his trial counsel was deficient in failing to argue that the false-accusation evidence was relevant to attack not only Santoyo's but also Marisela's and Contreras's identification testimony.  Not so.  Because nothing tied Santoyo to any false accusation, the trial court properly excluded the evidence as irrelevant.  There was a similar lack of evidence tying Marisela or Contreras to the claimed false accusations.  We find nothing in the record to suggest that Marisela and Contreras were present when Santoyo's mother was shot late at night in her home.  Jeremy conceded that "the only one that I seen that lived at the apartments was the elderly man that was in front of my house yelling that night."  The argument that defendant claims his counsel should have made has no support in the record.  The failure to make a meritless argument is not deficient performance.  (*Strickland*, *supra*, 466 U.S. at p. 676.)

Defendant claims his trial counsel was deficient in failing to argue that the false-accusation evidence was relevant to show a personal rather than a gang motive for the shooting.  He argues that the trial court recognized the existence of a feud and would have been receptive to an argument that the evidence was relevant to prove motivation "for a Garcia to make an ill-advised, personally-motivated, non-gang-related attack on the Santoyos."  He maintains that the trial court would have admitted the evidence.  He thus asserts that it is reasonably probable that he would have achieved a more favorable outcome on both the substantive charges and the gang enhancements.  We cannot agree.

Evidence that any Santoyo family member falsely accused Jeremy and/or Daniel was exceedingly weak, and there was no other evidence of a family feud.  The evidence was to the contrary.  Santoyo told Rowe that Daniel did not cause problems like defendant did.  Defendant's mother testified that her daughter went to high school with and was "currently" friends with Marisela.  Defendant's mother also testified that she told Santoyo's brother Gogie that she did not want the Santoyos to feel like the families were enemies "because we're not enemies."  Santoyo and Contreras said the neighborhood was

21

quiet before defendant moved back, and it became quite [sic] again after his arrest.  There were "[n]o shootings at all no more."

The fact that there was no evidence that anyone but defendant was feuding with the Santoyos supported an inference that the feud was gang-related.  Given the weakness of the false-accusation evidence to support a family feud, the strength of the evidence supporting a conclusion that defendant and Santoyo associated with rival gangs, and the lack of any evidence to suggest a "personal" rather than a gang-related basis for defendant's feud with the Santoyos, his trial counsel could reasonably have concluded that emphasizing the existence of a family feud would not advance his client's position.  A competent tactical decision is not deficient performance.  (*Strickland*, *supra*, 466 U.S. at p. 689.)  Defendant's trial counsel did not render ineffective assistance.

*People v. Garcia*, 2014 WL 295168, at *12-13.

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 686.  In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two factors.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *id.* at 687-88, "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689).

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*  "The likelihood of a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).  It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong, i.e., the second factor of the *Strickland* test, if the petitioner cannot establish incompetence, as required under the first prong.  *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential, and

22

1  when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation marks

2  and citations omitted).  "[T]he question [under § 2254(d)] is not whether counsel's actions were

3  reasonable.  The question is whether there is any reasonable argument that counsel satisfied

4  *Strickland*'s deferential standard."  *Id.*

5       Petitioner claims that his counsel was ineffective by failing to argue for the inclusion of the

6  false-accusation evidence on the grounds that it was relevant to impeach Marisela's and Contreras'

7  identifications.  This claim is meritless.  Even if counsel had raised this claim and preserved it for

8  appeal, the trial court would have excluded the evidence as irrelevant for the exact same reasons it

9  excluded it in reference to Santoyo.  As the appellate court pointed out, there was no evidence

10  whatsoever tying Santoyo to either incident and the same is true for Marisela and Contreras.

11  *Garcia*, 2014 WL 295168 at *13.

12       Petitioner also claims that his counsel was ineffective by failing to argue for the inclusion

13  of the same evidence on the grounds that it established a personal, non-gang-related motive for the

14  shooting.  Asserting this argument would have been equally futile for petitioner's counsel.

15  Whether the evidence was used to impeach witnesses or to establish a personal motive, it lacked

16  corroboration.  Defense counsel may therefore have reasonably believed that arguing for its

17  admission would have been unsuccessful.

18       In any event, the record makes clear defense counsels' strategy.  Counsel's primary

19  objective was to bolster the credibility of trial testimony of the prosecution witnesses that

20  exonerated petitioner.  Stressing evidence of a "family feud" between the Garcias and the

21  Santoyos risked undermining the credibility of the prosecution witnesses that petitioner was

22  identified at the scene by mistake.  Indeed, defense counsel presented testimony from petitioner's

23  mother that there was no feud between her family and the Santoyos and that the matter was simply

24  a misunderstanding.  6 RT 1403-06.  Nicasio testified that she encountered Santoyo in the

25  neighborhood and told him the families were "not enemies."  6 RT 1405.  "There is a strong

26  presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics

27  rather than sheer neglect."  *See Richter*, 562 U.S. at 109 (internal quotation marks omitted).

28       Finally, the state court could have reasonably concluded that no relief was warranted

United States District Court
Northern District of California

23

because petitioner failed to present evidence demonstrating that admission of the evidence would have yielded a more favorable result. *Strickland*, 466 U.S. at 694. As discussed above, the evidence tying petitioner to the crime was strong, as was the evidence of a gang motive.

Accordingly, petitioner is not entitled to habeas relief on this claim.

## C.    Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Warden Clark E. Ducart on the docket as the respondent in this action.

**IT IS SO ORDERED.**

Dated: 9/9/2015

HAYWOOD S. GILLIAM, JR.
United States District Judge

24